JUAN VALLDEJULI RODRÍGUEZ, demandante y recurrido, *v.* SECRETARIO DE HACIENDA, demandado y recurrente.

*Número:* 549 *Resuelto:* 24 de septiembre de 1963

18

20

*J. B. Fernández Badillo, Procurador General,* y *Genoveva R. de Carrera, Procurador General Auxiliar,* abogados del recurrente; *Elí B. Arroyo,* abogado del recurrido.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Hernández Matos emitió la opinión del Tribunal.

En septiembre de 1959 el contribuyente Juan Valldejuli Rodríguez presentó una demanda contra el Secretario de Hacienda ante la Sala de San Juan del Tribunal Superior, para que se dejaran sin efectos, en la medida en que las impugnaba, ciertas deficiencias en el pago de la contribución sobre ingresos para los años 1954 y 1955, por un monto de $99,031.87. En su párrafo 3 expuso:

"Las deficiencias notificadas son erróneas:

"*Año 1954*

 (a) se incluyó indebidamente como ingresos tributables las siguientes partidas:

 1. un supuesto beneficio de $3,800 realizado en la permuta de una finca rústica identificada con el número 3,833.

 2. un supuesto beneficio de $20,327.86 realizado en la permuta de la residencia del contribuyente.

 (b) se rechazó indebidamente las siguientes deducciones reclamadas por el contribuyente:

 1. contribuciones pagadas ............................ $ 606.84

2. gastos de viaje y misceláneas .................... 2,312.00
3. intereses adeudados por la suma de su-
 puestamente pagados por Juan T. Peña-
 garícano ..................................................... 480.00

*"Año 1955*

(a) se incluyó indebidamente como ingreso tributable la can-
tidad de $98,459.17 considerándose la suma recibida
como 'participación de beneficios' en la venta de una finca
en Isla Verde."

Se contestó la demanda negando que fuesen erróneas las
deficiencias notificadas. El juicio fue celebrado el 4 de marzo
de 1960. En su comienzo estipularon las partes que la con-
troversia quedaría limitada a dos partidas, o sean, la de
$3,800.00 del año 1954 y la de $98,459.17 de 1955. Se esti-
puló respecto a cierta prueba documental y con la testifical
que ofreció el demandante, allí quedó el caso sometido.

El 12 de enero de 1961 se falló. La sentencia dejó sin efec-
to las dos mencionadas deficiencias. Las determinaciones
de hecho del Tribunal Superior son así:

"DETERMINACIONES DE HECHO.—El demandante es abogado, agri-
cultor y recibe rentas. Comenzó a ejercer la profesión de abogado
desde el año 1922. Durante los años 1938 al 1944 adquirió por
compras las siguientes fincas (Exhibit 11 de ambas partes) locali-
zadas en el barrio Sabana Llana de Río Piedras, y todas colindan-
tes entre sí formando un solo cuerpo o fundo, con el propósito
de residir en ella y dedicarla a la explotación agrícola:

| Locali-zación | Fecha de Adquisición | Area (Cuerdas) | Comprada a | Escritura |
|---|---|---|---|---|
| Sabana Llana | 5/14/38 | 124.50 | Ernesto López | 113-Antonio López |
| " | 6/ 6/38 | 3.96 | Mauricio Viera | 15-Otto Riefkohl |
| " | 2/22/41 | 25.00 | Belén Vda. Tous | 17-R. Her-nández |
| " | 5/ 9/44 | 49.52 | Carlos Colón | 27-Sergio León |
| " | " | 1.00 | " " | 27-Sergio León |

"El demandante vivía con su familia en las fincas antes descritas, donde construyó un establo para vacas y sembró yerba y frutos menores. En 1945 la Autoridad Sobre Hogares le expropió parte de la finca, mudándose al pueblo de Cayey a una finca de 4.208 cuerdas que había adquirido por compra en diciembre de 1944, cediendo el uso de la residencia de Sabana Llana a un cuñado. En 1949 le vendió a la Autoridad Sobre Hogares el resto de la finca de Sabana Llana, ya que temía que la expropiaran.

"Al demandante se le concedió los beneficios de las disposiciones sobre ganancias de capital ('capital gains') en relación con esta transacción.

"En el período comprendido entre el 18 de diciembre de 1944 y 5 de diciembre de 1949 adquirió, alrededor de la finca de Cayey, otras más para formar un fundo agrícola que se enumeran a continuación:

| Localización | Fecha de Adquisición | Area (Cuerdas) | Comprada a | Escritura |
|---|---|---|---|---|
| Cayey | 12/18/44 | 4.208 | Carolina Núñez | 84-Angel M. Díaz |
| " | 4/27/45 | 164.9881 | Arturo Aponte | 84-Víctor M. Pons |
| " | 4/27/45 | 64.50 | Arturo Aponte | " |
| " | " | 4.50 | " | " |
| Cidra | 7/14/48 | 13.00 | Rosa M. Rodríguez | 217-Luis Rodríguez Morales |
| " | " | 3.00 | " | " |
| " | " | 20.00 | " | " |
| " | " | 12.00 | " | " |
| Cayey | 12/5/49 | 192.06 | | 153-Víctor M. Pons |

"En el 1945 recibió el dinero depositado en el caso de expropiación de Sabana Llana, con lo que adquirió las fincas en la zona Cayey-Cidra. Se llevó a trabajar con él a sus dos hijos que son ingenieros-agrónomos. Posteriormente, por haberse quedado

solo y no pudiendo atender el negocio, vendió a don Aurelio Tió todo el terreno que estaba cultivado de caña, quedándose solamente con una parcela de terreno en donde había construido su casa-residencia a un costo de $140,000.00. Al efectuar la venta al Sr. Tió, el demandante se quedó sin cuota para la siembra de caña, convirtiéndose la casa-residencia en un 'elefante-blanco', por lo que la permutó en 1954 por una finca en Guaynabo, propiedad de don Tomás Peñagarícano.

"En 26 de marzo de 1951 adquirió por compra y con fines agrícolas una finca en Isla Verde, jurisdicción de Carolina. La misma tenía 12,000 palmas de cocos en cuya fecha se vendían a un buen precio. Además, como tenía pastos, la utilizó para crianza de ganado de leche. Al hacer la referida inversión, tomó en consideración la localización de la finca en una zona que estaba adquiriendo auge económico debido a su proximidad al aeropuerto que entonces estaba en construcción.

"Como consecuencia de una notificación de deficiencia en contribución sobre ingresos, que consideró injusta, decidió vender todas sus propiedades e irse de Puerto Rico. A tono con esta decisión, vendió en 1953 la finca en Isla Verde . . . por $202,000, más una suma adicional equivalente a la tercera parte de la diferencia entre el precio de la venta y el precio en que los compradores vendieran en el futuro si excedía del primero. Los compradores vendieron la finca y cada uno pagó al demandante el precio en exceso de lo acordado.

"En 1954 adquirió en permuta una finca en Guaynabo entregando su residencia en Cayey y compró una finca en Vega Alta de alrededor de 98 cuerdas a donde trasladó su residencia, reconstruyendo la casa que allí había. La finca en Guaynabo la dejó en arrendamiento al anterior dueño, Sr. Peñagarícano, para que éste estableciera la cuota de caña de la finca de Cayey que adquirió del demandante. Este arrendamiento duró de tres a cuatro años. El demandante tenía planes de dedicar la finca de Guaynabo a la agricultura y al negocio de ganado y lechería con la ayuda de uno de sus hijos que había regresado. Esta finca la vendió en 1958 porque le ofrecieron y acordó con el comprador un precio de $900,000.00. La parte demandada aceptó que la ganancia obtenida en dicha venta era una ganancia de capital ('capital gain') a largo plazo.

"La finca adquirida en Vega Alta en 1954, junto con su residencia allí establecida, la vendió en 1957 al Sr. Miguel Martorell

"A fines de 1956 y a principios de 1957, compró dos fincas, colindantes entre sí, en el barrio Sabana Seca de Toa Baja. Arendó [sic] parte de la finca a la Radio Corporation of America por un canon mensual de $250.00 hasta octubre de 1959 y de $375.00 a partir del indicado mes. Construyó su residencia en esa finca y dedicó las tierras no arrendadas a la ganadería. A la fecha de la vista ante este Hon. Tribunal, el demandante aún es titular de la referida finca, y la dedica a las mismas actividades y reside en ella.

"En 1956 adquirió una pequeña finca para veraneo en el Barrio Jagueyes de Aguas Buenas, de la cual aún es dueño.

"Durante el año 1958 el demandante adquirió un condominio de una mitad en una finca en Loíza con una cabida de alrededor de 783.00 cuerdas. La compró para dedicarla, y la dedica, a ganado y pasto pensando en el auge que tomará el negocio de ganado en Puerto con la construcción de un matadero moderno en la ciudad de Caguas auspiciado por el Gobierno del Estado Libre Asociado de Puerto Rico y con los incentivos contributivos que éste ofrece a los ganaderos. El demandante aún es titular de esta finca.

"En las fincas antes mencionadas el demandante nunca construyó calles, alcantarillado, ni otras mejoras similares. Sólo las ha cercado y construido o reconstruido casas para su residencia.

"Nunca hizo campañas o anuncios para las ventas de dichas fincas, ni solicitó corredores para gestionar compradores.

"En 1937 el demandante adquirió por compra la finca Hyde Park en Río Piedras, a la cual llevó algunos materiales para hacer su casa los que le robaron en más de una ocasión. Resolvió que era indeseable hacer su casa cerca del arrabal El Monte en dicha jurisdicción, y dio la finca en arrendamiento al señor Nevárez, quien es hoy dueño de una fábrica de ventanas. Las vacas que este señor llevó a la finca se las ordeñaban de noche, le robaban los becerros y cerdos, por cuyo motivo devolvió la finca al demandante dando por terminado el arrendamiento. Hizo gestiones para que el Gobierno se la comprara para el traslado del Asilo de Niños; luego la ofreció a la Autoridad de Hogares (Insular) y luego a la Autoridad de Hogares (Municipal). En todos los casos rechazaron la oferta debido a la cercanía del mencionado arrabal. Aconsejado por los señores Campos del Toro y Hostos Gallardo, urbanizó la finca para poder venderla. Estos señores consiguieron el financiamiento. Al estancarse las ventas de sola-

res, el señor Gallardo le indicó la organización de una corporación para construir cien casas en los solares y facilitar las ventas, de cuya corporación el demandante fue accionista y presidente. A la fecha de la celebración de la vista ante el Tribunal, la corporación no había sido disuelta pero estaba inactiva.

"El demandante declaró que obtuvo ingresos de su profesión los que en algunos años declaró y en otros no declaró; que cuando los clientes no pueden pagarle siempre les presta sus servicios."

El funcionario demandado nos pidió la revisión del fallo por nueve fundamentos que señala en su solicitud. El 18 de diciembre de 1961, decidimos revisarlo "solamente en cuanto a la determinación del tribunal sentenciador de que el contribuyente no era un agente de bienes raíces . . . ."

El Procurador General sometió su alegato sobre el punto de revisión permitido. En el suyo, el recurrido, por primera vez, niega que tengamos jurisdicción para entender en este recurso "en vista de que la petición de revisión fue notificada por correo certificado, siendo recibida por el recurrido en 17 de julio de 1961." En un alegato adicional el recurrente expuso las razones que tenía para oponerse a la desestimación por falta de jurisdicción.

I

Consideremos en primer lugar el incidente sobre desestimación. Los cómputos de la contribución envuelta fueron aprobados el 15 de junio de 1961. El 14 de julio de 1961 presentó el funcionario recurrente en nuestra secretaría: su solicitud de revisión, memorando de autoridades, copias de las alegaciones de las partes, de las conclusiones y sentencia del tribunal de instancia y, además, copia de la transcripción de evidencia.

Al calce de la solicitud de revisión hizo constar que desde San Juan, P.R., en el mismo día 14 de julio de 1961: "he remitido copia del anterior escrito y del memorandum de autoridades que se acompaña al mismo, al demandante recurrido a su dirección postal, Apartado 609, San Juan, Puerto Rico."

Las copias así remitidas el día 14 de julio de 1961, es decir, dentro del término de 30 días legales fijados para solicitar la revisión, fueron *recibidas* por el recurrido el 17 de julio de 1961. Dice éste, en parte, a la página 2 de su alegato:

"La Regla 53.3 exige que la solicitud de revisión sea notificada *'dentro* del término para solicitar dicha revisión', en este caso, *dentro* de los 30 días siguientes a 15 de junio de 1962, fecha en que se aprobaron los cómputos. El recurrente, si bien presentó su petición ante el Tribunal en 14 de julio, o sea, dentro del término de ley, no notificó su solicitud dentro de dicha término. Ello es así porque, sin haber hecho gestiones para hacer una notificación personal, el personal, el recurrente escogió el método alterno de notificar por correo. Con ello se corrió el riesgo de que la notificación no se hiciere—como no se hizo—*dentro* del término de ley ya que la notificación se hizo el día 17 de julio, ya transcurridos los 30 días."

■ El anterior procedimiento provisto por el Código de Enjuiciamiento Civil para los apelantes perfeccionar sus recursos de apelación en casos civiles, que se mantuvo inalterado con las Reglas de Enjuiciamiento Civil de 1943, sufrió un importante cambio con el advenimiento de las Reglas de Procedimiento Civil de 1958. Consistió en que habiendo las Reglas de 1958 derogado expresamente, a través de la Núm. 72, los Art. 320 y 321 del Código de Enjuiciamiento Civil, hoy día se permite que se realice la notificación del recurso presentado ya mediante entrega personal, ya por correo, indistintamente. Es decir, dejó de ser un requisito indispensable para que pudiera efectuarse la notificación por correo, el que las partes residieran o tuvieran sus oficinas en distintos puntos, entre los cuales hubiere un servicio regular de comunicaciones por correo o cuando resultaban infructuosas las gestiones señaladas por ese Art. 320 que disponía la forma en que debía hacerse la notificación mediante entrega personal. En California al interpretar los Arts. 1012 y 1013 del Código de Enjuiciamiento Civil (equivalentes a los Arts. 320 y 321 nuestros) se continúa confiriéndole primacía a la notificación

personal sobre la notificación por correo. *Harris* v. *Minnesota Inv. Co.*, 265 Pac. 306, comentado en *Tecon Corp.* v. *Srio. de Hacienda*, 84 D.P.R. 190 (1961); *Dearing* v. *Fessler*, 215 P.2d 60, 96 C.A.2d 386 (1950).

■ De acuerdo con la Regla 53.1(b) de 1958 el recurso de revisión "se formalizará presentando una solicitud en la Secretaría del Tribunal Supremo dentro de los treinta (30) días siguientes al archivo en autos de una copia de la notificación de la sentencia dictada por el Tribunal Superior." La Núm. 53.3, por su parte, exige la notificación por el recurrente de la presentación de la solicitud de revisión a todas las partes contrarias dentro de esos 30 días en la forma prescrita en la Regla 67, que en lo pertinente dispone:

"67.2—Siempre que una parte haya comparecido representada por abogado, la notificación se hará al abogado, a menos que el tribunal ordene que la notificación se haga a la parte misma. La notificación al abogado o a la parte se hará *entregándole copia o remitiéndosela por correo* a su última dirección conocida, *o de ésta no conocerse dejándola en poder del secretario del tribunal.* Entregar una copia, conforme a esta regla, significa ponerla en manos del abogado o de la parte, o dejarla en su oficina en poder de su secretario o de otra persona a cargo de la misma; o, si no hubiere alguien encargado de la oficina dejándola en algún sitio conspicuo de la misma, o si la oficina estuviere cerrada o la persona a ser notificada no tuviera oficina, dejándosela en su domicilio o residencia habitual en poder de alguna persona de suficiente edad y discreción que resida allí. *La notificación por correo quedará perfeccionada al ser depositada en el correo.*" (Énfasis suplido.)

■ Como es de observar la citada regla no coloca en grado preferente a la notificación personal sobre la notificación por correo ni exige que se notifique siempre y en primer lugar al abogado de la parte a notificarse. Provee tres medios distintos de hacer la notificación: 1) mediante entrega, 2) por correo, y 3) dejando el documento en poder del secretario del tribunal. Establece además varios modos de hacer la entrega material y directa. Cuando se decide hacer la notificación por correo el

factor decisivo y determinante de su perfección lo es el momento en que se deposita en el correo el sobre conteniendo los documentos que se notifican.

Las Reglas de Enjuiciamiento Civil de 1943 contenían un precepto sustancialmente similar a la transcrita Regla 67.2. Estaba en la Regla 5(b), equivalente a la 5(b) federal. No obstante, la jurisprudencia interpretativa sobre su aplicación que precedió a las Reglas de 1958 no era uniforme.

En *Cardona* v. *Ortega*, 68 D.P.R. 658, 660 (1948), por ejemplo, el apelado solicitó la desestimación del recurso por razón de que el escrito de apelación le fue notificado a su abogado por correo y no personalmente, a pesar de que dicho abogado y el del apelante no tenían sus oficinas en distintos puntos. Este Tribunal denegó la desestimación por entender que la Regla 5(b) "sustituye el procedimiento establecido anteriormente por el artículo 321 del Código de Enjuiciamiento Civil y autoriza la notificación por correo al abogado contrario sin la limitación que antes existía, de que la persona que remitía la notificación debía residir o tener su oficina en un punto distinto . . . ." En cambio, en *Hernández* v. *Corte Municipal*, 69 D.P.R. 887, 890 (1949), en donde estaba envuelta la interpretación de la Regla Núm. 6(e), resolvió que las Reglas de 1943 no contenían precepto alguno sobre el procedimiento apelativo y que por lo tanto nada de lo en ellas provisto era aplicable a las apelaciones. En *Collazo* v. *Puig y Abraham*, 70 D.P.R. 817, 819 (1950) se reitera que "el procedimiento para regular los trámites apelativos no está comprendido en las Reglas de Enjuiciamiento Civil." La misma doctrina es invocada en *Vigio* v. *Cartagena*, 70 D.P.R. 596, 598 (1949); *Pueblo* v. *Carmona*, 70 D.P.R. 312, 315 (1949); *Rodríguez* v. *Fonalledas*, 71 D.P.R. 836, 838 (1950). Pero con la aparición de las Reglas de Procedimiento Civil de 1958 y la consiguiente derogación de los Arts. 320, 321 y 322 del Código de Enjuiciamiento Civil por dichas reglas, se ha borrado toda

duda que pudiera existir en cuanto a cuáles serían las normas para perfeccionar los recursos de apelación y revisión.

En *Figueroa Rivera* v. *Tribunal Superior,* 85 D.P.R. 82 (1962) (Santana Becerra), al referirse a *Hernández* v. *Corte Municipal,* supra, dijimos:

"Ahora las Reglas de Procedimiento rigen el trámite de la apelación y de la revisión, lo cual nos impide disponer de este caso escuetamente por lo decidido en el de *Hernández.*"

■ La notificación quedó perfeccionada dentro del término de ley. El recurrente depositó en el correo la notificación de su solicitud de revisión el 14 de julio de 1961, un día antes de la fecha en que vencía el término para solicitar revisión. La notificación no fue *recibida* hasta el 17 de julio de 1961 pero el depósito en el correo de la notificación del recurso instado el 14 de julio dio cumplimiento oportuno al requisito contemplado por la Regla 67.2.

La Regla 67.2, como ya expusimos, es sustancialmente similar a la suplantada Regla 5(b) de 1943. Al igual que en ambas, el derogado Art. 322 del Código de Enjuiciamiento Civil preceptuaba que la notificación quedaba cumplida al momento de hacerse el depósito en el correo. *Serra* v. *Corte Municipal,* 49 D.P.R. 542 (1936); *Ex parte Bithorn Vda. Benítez,* 53 D.P.R. 584, 585 (1938); *Rodríguez* v. *Fonalledas,* 71 D.P.R. 836, 839 (1950); *Alonso* v. *Muñoz,* 74 D.P.R. 875, 876 (1953); *Tugwell, Gobernador* v. *Barreto,* 67 D.P.R. 546, 551 (1947).

Vigentes las Reglas de 1943, operaba a plenitud la disposición de que la notificación quedaba cumplida con el depósito en el correo (Art. 322 C.E.C.) cuando las partes residían en distintos puntos (Art. 321 C.E.C.) o cuando resultaban infructuosas las gestiones del Art. 320 (C.E.C.). Sin embargo, cuando no se daba alguna de las circunstancias antes descritas era necesario limitar los efectos de la disposición del Art. 322 de modo que armonizara con el 320 y 321. Y así resultaba que si se escogía el medio de la notificación por correo cuando

procedía el de la entrega personal se corría el riesgo de que si no se recibía dentro del término para apelar la notificación era insuficiente. *Santana* v. *Salinas*, 54 D.P.R. 116, 120 (1939); *Arandes* v. *Viera*, 75 D.P.R. 157, 160 (1953). Si la parte contraria recibía la notificación dentro del término para apelar se decía que eso equivalía a una notificación personal. *Despiáu* v. *Pérez*, 76 D.P.R. 123, 125 (1954); *Collazo* v. *Puig y Abraham*, 70 D.P.R. 817, 819 (1950).

Efectuándose el depósito en la oficina postal dentro del término para apelar o solicitar revisión, el recibo del documento remitido, más allá de dicho término, en nada afecta la jurisdicción del tribunal de revisión o apelación. Dice Moore's *Federal Practice*, Vol. 1, pág. 376, en sus comentarios a la Regla 5(b) federal, equivalente a la 67.2 nuestra:

"Debe notarse que la última oración de la Regla 5(b) [67.2] provee que la notificación por correo quedará perfeccionada al ser depositada en el correo. Esto es significativo. El no recibo del documento no afecta la validez de la notificación."

Vide *Cardona* v. *Ortega*, supra, pág. 661.

En Barron, Darnieder y Keogh *(Federal Practice and Procedure*, Vol. 5, pág. 103, 1951), encontramos también un comentario similar:

"El segundo método de notificación bajo la Regla 5(b), es por correo y el mismo se perfecciona con el depósito. Por lo tanto, el depósito en el correo del documento el último día constituye una notificación válida aunque no se reciba hasta varios días luego de haber expirado el período dado para tomar acción en el caso en particular."

Ver, además, Barron & Holtzoff—*Federal Practice and Procedure* Vol. 1, Sec. 204, pág. 766, (1960); *Cyclopedia of Federal Procedure*, Vol. 4, Sec. 12–10, págs. 9, 10 (1951).

La jurisprudencia norteamericana en el campo procesal civil federal también ha sido consistente en igual interpretación dada a la Regla 5(b) [67.2] que la que se ha indicado de los referidos autores. A este respecto, véanse *Frierson* v.

*McIntyre*, 151 F.Supp. 5, 6 (1953); *Beckstrom* v. *Coastwise Line*, 13 F.R.D. 480, 483 (1953); *Bourne Inc.* v. *Romero*, 23 F.R.D. 292, 296 (1959); *Rifkin* v. *United States Lines*, 24 F.R.D. 123 (1959); *Napier* v. *The Delaware, Lackawanna and Western Railroad Company*, 223 F.2d 28, 30 (1955); *Williams* v. *Blitz*, 226 F.2d 463, 464 (1955).

El recurrido nos cita en apoyo de su contención el caso de *Tecon Corp.* v. *Srio. de Hacienda*, 84 D.P.R. 190 (1961). Sin embargo, *Tecon Corporation* es inaplicable al presente, toda vez que fue resuelto bajo las disposiciones del Código de Enjuiciamiento Civil actualmente abolidas. La copia de la notificación de la sentencia fue archivada en aquel caso el día 7 de marzo de 1957 y el término para apelar vencía, por lo tanto, el día 6 de abril de 1957. O sea, que las incidencias respecto del trámite apelativo ocurrieron con anterioridad a la aprobación de las Reglas de Procedimiento Civil de 1958 y por consiguiente le eran inaplicables.

Por lo anteriormente expuesto no procede la desestimación del recurso por falta de jurisdicción.

## II

Pasemos a considerar los méritos del recurso. A juicio nuestro fue correcta la determinación del tribunal sentenciador en el sentido de que el recurrido no era un agente de bienes raíces, por lo cual debe confirmarse su fallo. Veamos.

▆▆▆ Entre las medidas de alivio contenidas en la Ley de Contribuciones Sobre Ingresos de 1954 en favor del contribuyente, una de las más interesantes es la que se refiere a las Ganancias y Pérdidas de Capital. Se encuentra dispuesta en su Sec. 117.([1]) La ganancia realizada en la venta o per-

---

([1]) En lo relevante, la parte de esa sección, de mayor pertinencia, según aprobada en ese año—Leyes de 1954(1) pág. 663—es como sigue:
"Sección 117.—*Ganancias y Pérdidas de Capital.*
 (a) *Definiciones*—Según se emplean en esta Ley-(1) *Activos de Capital.*—El término 'activos de capital' significa propiedad po-

muta de propiedad poseída por un negociante en bienes raíces *(dealer)* es generalmente considerada como un ingreso ordinario, mientras que la ganancia realizada en la venta o permuta de una propiedad poseída por un "inversionista" constituye una ganancia de capital. Tal diferencia en tratamiento descansa en lo que dispone la Sec. 117(a)(1)(A) al definir lo que son "activos de capital". El término "activos de capital", según dicha sección, significa propiedad poseída por el contribuyente relacionada o no con su industria o negocio, pero no incluye, entre otras, "propiedad poseída por el contribuyente primordialmente para la venta a parroquianos en el curso ordinario de su industria o negocio." Así, de modo que podamos calificar al recurrido ya como un negociante en bienes raíces o meramente como un inversionista, la verdadera cuestión a determinar es si poseyó las propiedades objeto de la deficiencia contributiva "primordialmente para la venta a parroquianos en el curso ordinario de su negocio." Mertens, *Law of Federal Income Taxation*, Vol. 3B, Sec. 22.138, pág. 622. Tal determinación es una de hecho. *Patterson* v. *Belcher*, 302 F.2d 289, 297 (1962); *Loans and Service, Inc.* v. *United States*, 193 F.Supp. 683, 686 (1961); *Cebrian* v. *U.S.*, 181 F.Supp. 412, 418 (1960). Siendo ello así, la misma se sostendrá siempre que represente el balance más racional, justiciero

---

seída por el contribuyente, relacionada o no con su industria o negocio, pero no incluye—

 (A) existencias en el negocio del contribuyente u otra propiedad de tal naturaleza que estaría propiamente incluida en el inventario del contribuyente si estuviere en existencia al cierre del año contributivo, o propiedad poseída por el contribuyente primordialmente para la venta a parroquianos en el curso ordinario de su industria o negocio; o

 (B) propiedad usada en su industria o negocio, de índole sujeta a la concesión por depreciación provista en la sección 23(1), o propiedad inmueble usada en su industria o negocio.

 (2) *Ganancia de capital a corto plazo.*—El término 'ganancia de capital a corto plazo' significa la ganancia en la venta o permuta de un activo de capital poseído por no más de 6 meses si, y hasta el monto en que, dicha ganancia se toma en cuenta al computarse el ingreso bruto."

y jurídico y no sea, por lo tanto, clara y manifiestamente errónea. Regla 43.1 de Procedimiento Civil de 1958; *Goenaga* v. *O'Neill de Milán*, 85 D.P.R. 170 (1962); *Friend* v. *Comm'er*, 198 F.2d 285, 287 (1952); Weithorn, *"Dealer"* v. *"Investor" Problem*, 11 Tax L. Rev. 157, 161 (1956); *Campbell County State Bank Inc. of Herreid* v. *C.I.R.*, 311 F.2d 374, 377 (enero 3, 1963); *Loco Realty Co.* v. *C.I.R.*, 306 F.2d 207, 209 (1962); *Freedman* v. *C.I.R.*, 301 F.2d 359, 360 (1962); *Schoenberg* v. *C.I.R.*, 302 F.2d 416, 419 (1962); *Urban Redevelopment* v. *C.I.R.*, 294 F.2d 328, 332 (1961); *Sachs* v. *C.I.R.*, 277 F.2d 879, 881 (1960).

Las cortes han desarrollado una serie de factores en la determinación de si una propiedad es poseída primordialmente para la venta en el curso ordinario del negocio. Entre ellos se encuentran: (a) el propósito por el que se adquirió la propiedad; (b) el propósito por el que se poseyó; (c) las mejoras realizadas por el contribuyente y el alcance de éstas; (d) la frecuencia, el número y continuidad de las ventas; (e) la naturaleza y extensión del negocio del contribuyente; (f) el alcance de la publicidad llevada a cabo para promover las ventas o las ausencia de tal publicidad. Mertens, *Law of Federal Income Taxation*, Sec. 22.15, pág. 77; *Stockton Harbor* v. *Comm.*, 216 F.2d 638, 650 (1954) y otros casos allí citados. Estos factores así como cualesquiera otros que asistan a la determinación de si se posee ya para la venta o ya con fines de inversión deben ser considerados al decidir si se actúa en concepto de negociante en bienes raíces (*dealer*) o en concepto de "inversionista" a los efectos del beneficio sobre ganancia de capital que concede la Sec. 117 de la Ley. No obstante, no puede señalarse que a un factor determinado deba atribuírsele mayor importancia que a otro. La importancia de cada uno depende del conjunto de hechos de cada caso en particular. Por tal razón se ha dicho con corrección que en lugar de "reglas" son simples guías que sirven de ayuda a la determinación de si se es un *dealer* o un *inversionista*. Pennell,

*Capital Gains in Real Estate Transactions,* Tulane Tax Institute, pág. 23 (1959).

 Dijimos en *Nolla* v. *Sec. de Hacienda,* 76 D.P.R. 769, 776 (1954):

"Los casos en este campo son a veces difíciles de reconciliar. Se les ha llamado un 'mare mágnum'. Miller, *The 'Capital Asset' Concept: A Critique of Capital Gains Taxation,* 59 Yale L.J. 837, 863, escolio 134; id., pág. 877. Esto se debe en parte a la circunstancia de que cada caso debe resolverse por sus hechos; también se debe en parte a la falta de precisión y de claridad en la norma estatutaria."

En *Austin* v. *C.I.R.,* 263 F.2d 460, 462 (1959), se dijo lo siguiente: "En análisis final, sin embargo, cada caso debe ser decidido sobre sus hechos particulares, y la presencia de alguno o algunos de estos factores puede o no puede ser determinante en el caso en particular. Es raro que al aplicar la decisión de un caso a los hechos de otro caso se pueda encontrar un precedente de valor. A lo sumo, otros casos decididos en esta materia pueden ser persuasivos o sugestivos." Cf. *Keliher* v. *Brownell,* 192 F.Supp. 548, 550 (1961); *Alabama Mineral Land Co.* v. *Commissioner,* 250 F.2d 870, 872 (1957); *Sovereign* v. *C.I.R.,* 281 F.2d 830, 833 (1960); *Wood* v. *C.I.R.,* 276 F.2d 586, 590 (1960); *Pool* v. *Commissioner of Internal Revenue,* 251 F.2d 233, 236 (1957); *Tidwell* v. *C.I.R.,* 298 F.2d 864, 866 (1962).

 Un detenido examen de toda la evidencia demuestra que actuó correctamente el tribunal al resolver que el demandante-recurrido no era un "negociante en bienes raíces" y que de esa manera tenía derecho a que se le impusiera la tributación a base del 25% y no a base de 100% como ocurre con el ingreso ordinario.

En *Boomhower* v. *U.S.,* 74 F.Supp. 997, 1007 (1947), se dijo:

". . . se ha sostenido frecuentemente que el hecho de que la propiedad envuelta no fuera originalmente adquirida para el

propósito de venta no impide que las actividades del contribuyente en relación con la venta de la propiedad constituya un negocio. Sin embargo, las razones y circunstancias que circundan la adquisición original le imparten color a la transacción en su totalidad y ayudan en la interpretación de la conducta del contribuyente."

Cf. *Dougherty* v. *Comm.*, 216 F.2d 110, 111 (1954); *Hollis* v. *United States*, 121 F.Supp. 191, 194 (1954); *Fowler* v. *United States*, 154 F.Supp. 859, 862 (1957); 46 A.L.R.2d 636, Sec. 4 (a).

Sin duda que la intención del contribuyente al momento de la adquisición aunque por sí solo no resulta ser un factor decisivo determinante nos facilita grandemente la determinación de si poseyó con el fin primordial de vender o si con otros fines. Véase a este respecto el artículo publicado en 2 Tax L. Rev., *"Dealing in Real Estate"*, Fink (1946).

La evidencia desfilada y creída por el tribunal sentenciador probó satisfactoriamente que Valldejuli Rodríguez, al adquirir las propiedades, no tenía el propósito de dedicarse a la compra y venta de bienes raíces. En la adquisición de las propiedades perseguía otros fines que el de reventa, es decir, la agricultura y la ganadería.

Y una inspección del récord nos revela incuestionablemente que esa intención y propósito se manifestó objetivamente mediante actos que reflejan una conducta consistente con el ánimo presente en el recurrido al momento de adquirir las propiedades en cuestión. Veamos: (a) En las fincas que adquirió por compra durante los años de 1938 al 1944 el recurrido vivía con su familia y realizó en ellas obras esencialmente de carácter agrícola y de ganadería tales como la construcción de un establo para vacas y la siembra de yerba y frutos menores; (b) a las fincas localizadas en la zona Cayey-Cidra, las que adquirió con el fin de establecer un fundo agrícola, llevó consigo a trabajar a sus dos hijos que son ingenieros-agrónomos. Estas fincas contenían una cuota para la caña y en efecto gran parte de ellas estaban cultivadas de caña.

En dicha finca también había establecido su residencia y para ese propósito construyó una casa a un costo de $140,000; (c) la finca en Isla Verde, adquirida en 1951, la utilizó para crianza de ganado de leche; (d) la finca de Guaynabo que adquiriera por permuta en 1954 con su finca de Cayey, la dejó en arrendamiento a su anterior dueño el Sr. Peñagaricano. Este arrendamiento tuvo un término de duración de tres a cuatro años; (e) en la finca que compró en Vega Alta en 1954 reconstruyó una casa trasladando allí su residencia; (f) parte de las dos fincas colindantes entre sí que adquiriera en el barrio Sabana Seca de Toa Baja durante los años 1956 y 1957, la arrendó a la Radio Corporation of America y la parte no arrendada la dedicó a la ganadería. También trasladó allí su residencia. Más aún, a la fecha de la vista las continúa dedicando a esas actividades y vive en ella; (g) el condominio de una mitad en la finca de Loíza adquirida en 1958 a la fecha de la vista la continúa dedicando a ganado y pasto.

 Difícilmente puede argüirse que la actitud mostrada por el recurrido durante el tiempo de posesión de las fincas descritas sea una equivalente a la que usual y corrientemente evidencia aquel cuyo fin primordial es el de vender lo adquirido por el incentivo del lucro que habrá de obtener en dicha venta. "En términos generales puede decirse que un 'dealer' es una persona que lleva a cabo determinadas actividades que constituyen la operación ordinaria de un negocio para el cual adquiere propiedad con el propósito de venderla luego con ganancia. Por otro lado, un inversionista es uno que adquiere propiedad *por razón del ingreso que la misma producirá más bien que por la ganancia que pueda obtenerse en la reventa.*" Genovevo Meléndez Carruccini, *Manual de Ganancias y Pérdidas de Capital*, Tomo 1, pág. 220 (1962). (Énfasis suplido.) En este caso las propiedades fueron compradas con el consistente propósito de que las mismas le produjeran ingresos a su dueño mediante la explotación agrí-

cola y ganadera mas no con la finalidad primordial de reventa y la consiguiente obtención de lucro. No hubo evidencia que atestiguara un cambio en tal intención o propósito. En *Goldberg* v. *Comm.*, 223 F.2d 709, 712 (1955) se dijo:

"Si la propiedad fue originalmente adquirida para propósitos de alquiler, puede, sin embargo, ser luego poseída para la venta a parroquianos en el curso ordinario del negocio; y lo contrario puede ser cierto también. Pero el propósito original es importante, ya que para contrapesarla debe haber evidencia significativa de carácter objetivo de que ha ocurrido un cambio en ese propósito."

La venta por el recurrido de gran parte de sus propiedades mediante la aceptación de ofertas razonables tampoco lo convierte en un negociante en bienes raíces. En *Austin* v. *United States*, 116 F.Supp. 283, 286 (1953) se expresó el tribunal:

"En mi opinión un contribuyente puede mantener una actitud favorable hacia la venta y puede de hecho vender y liquidar sus propios activos y en ausencia de cualquier otro indicio de actividad en bienes raíces no adviene por ello un contribuyente dedicado al negocio de bienes raíces. Y esto es así ya se venda una cantidad grande o pequeña. Este es el tipo de situación de hecho que la sección 117 fue dirigida a cubrir."

Estamos en plena conformidad con lo dicho en el caso de *Austin*. Por ello, creemos que la conducta adoptada por el recurrido y su testimonio al efecto de que aceptaba ofertas siempre que le representaran un buen negocio, no pugna con la condición de "inversionista". Tal hecho no puede por sí solo dejar demostrado que poseyó las propiedades primordialmente para la reventa. La conducta manifestada por Valldejuli Rodríguez no es otra que la que usualmente expresaría todo hombre normal y corriente bajo circunstancias similares.

Para que se entienda excluido del cuadro que comprende la definición de "activos de capital" de la Sec. 117 de la Ley, no basta demostrar que se posee primordialmente para

la venta. Es necesario además establecer que se posee para la venta "en el curso ordinario del negocio". Y en la determinación de si el contribuyente se dedica al negocio de bienes raíces a efectos de la referida sección, las cortes han considerado primordialmente el alcance de las actividades en las ventas llevadas a cabo por el contribuyente, la frecuencia y continuidad en las transacciones, el tiempo dedicado en la actividad en particular, etc. 46 A.L.R.2d, págs. 649, 656, 657; *Thomas* v. *Wood,* 16 T.C. 213, 226 (1951).

Tratemos primeramente el primero de los factores mencionados—las actividades de ventas por el contribuyente. El método que se utilice al disponer de la propiedad tiene pues gran significación. En este sentido cobran importancia todas aquellas medidas que tengan por fin el atraer compradores. Weithorn, *"Dealer* v. *Investor Problem"*, 11 Tax L. Rev. 157, (1956). Entre esas actividades se mencionan las mejoras a la propiedad con el propósito de atraer compradores, la circulación de listas de precios, el mantenimiento de signos indicativos de que la propiedad está disponible para la venta, la búsqueda o gestión de posibles compradores, la publicidad que se lleve a cabo a través de anuncios en los periódicos, el mantenimiento de oficina de ventas y otras análogas. Mientras más se realicen estas actividades mayor probabilidad habrá para la calificación de negociante en bienes raíces *(dealer)*. *Palos Verde Corp.* v. *United States,* 201 F.2d 256 (1952); *Friend* v. *Comm.,* 198 F.2d 285, 287, 289 (1952); *King* v. *Comm.,* 189 F.2d 122, 124 (1951); *Galena Oaks Corp.* v. *Scofield,* 116 F.Supp. 333, 335 (1953); *Boomhower* v. *United States,* supra (1947); *South Texas Properties,* 16 T.C. 1003, 1009 (1951); *Frieda J. Farley,* 7 T.C. 198 (1946). La prueba creída por el tribunal inferior nos indica que el recurrido, con excepción de la finca Hyde Park, nunca construyó calles, alcantarillado ni otras mejoras similares; nunca hizo campañas o anuncios para promover las ventas ni solicitó corredores para gestionar compradores. Sólo con propósitos de

residencia las ha cercado, construido o reconstruido. Ante ese estado de hechos no es posible concluir que la conducta por él manifestada es la que comúnmente se conoce de uno que posee primordialmente para la venta.

Sostiene el recurrente que erró el tribunal inferior al ignorar el hecho de la "frecuencia y continuidad de las transacciones" en bienes raíces del contribuyente.

██ Estrechamente relacionado con el criterio de "las actividades para promover las ventas" se encuentra el de la "frecuencia y continuidad" de las transacciones. Mertens, *Law of Federal Income Taxation*, Vol. 3B, pág. 624; Pennell, *Capital Gains in Real Estate Transactions*, Tulane Tax Institute, pág. 35 (1959). No es un factor por sí mismo concluyente y su aplicación depende del resultado de otros factores. *Lobello* v. *Dunlap*, 210 F.2d 465, 468 (1954). Debemos considerarlo a la luz de lo expresado por el tribunal en *Farley* v. *Comm.*, 7 T.C. 198, 202 (1946), citado en *Nolla* v. *Sec. de Hacienda*, supra, a la página 775:

"El demandado sostiene primordialmente que las ventas de que se trata eran tan frecuentes y continuas que tal actividad constituía una industria o negocio. Es indudable que la frecuencia y continuidad con que se lleva a efecto una actividad específica es una consideración primordial para determinar si tal actividad constituye una industria o negocio. *Es significativo indicar, sin embargo, que los casos que han aplicado esta norma a transacciones de bienes raíces envolvían elementos de fomento y actividades sustanciales de ventas que están esencialmente ausentes en el presente caso.* Véanse *Richards* v. *Commissioner*, supra; *Snell* v. *Commissioner*, supra; *Welch* v. *Solomon*, supra; *Ehrman* v. *Commissioner*, supra; *Oliver* v. *Commissioner*, 138 F.2d 910; *Gruver* v. *Commissioner*, supra; *Brown* v. *Commissioner*, supra; *James Lewis Caldwell McFadden*, 2 T.C. 395. En ninguno de estos casos mantuvo el contribuyente la actitud pasiva observada por el peticionario en este caso." (Énfasis suplido.)

Un lenguaje similar es utilizado en *Goldberg* v. *Commissioner*, 223 F.2d 709, 712 (1955):

"Sobre cuán frecuentes son las ventas depende de muchas circunstancias; el alcance en la promoción y gestión de ventas por el vendedor, el número de unidades en el proyecto de alquiler, y la situación del mercado. Únicamente la primera de estas circunstancias tiene alguna conexión racional con la cuestión de si el dueño ha cambiado su negocio al de venta o si meramente está liquidando su negocio. *Así la frecuencia y continuidad de las ventas como factor es significativo únicamente si se justifica razonablemente la conclusión de que el dueño ha promovido en alguna forma las ventas.*" (Énfasis suplido.)

No existiendo, por lo tanto, las actividades en las ventas que justifique la aplicación del criterio de la "frecuencia y continuidad", creemos que actuó acertadamente el juez sentenciador al ignorarlo. Pero con esto no queremos decir que la ausencia en las actividades de venta en todo caso deba traer consigo necesariamente un tratamiento de ganancia de capital. Como al principio apuntamos, deben examinarse los hechos en conjunto de cada caso en particular. El factor de la "frecuencia y continuidad" en un caso dado mirado en relación con otros factores y aun estando ausentes las actividades en ventas, puede ser exageradamente poderoso como para hacer forzoso que la ganancia sea considerada como un ingreso ordinario. La ausencia de actividades en ventas puede no ser un factor determinante, por ejemplo, cuando la demanda por la propiedad de que se trata resulte ser tan grande que no haga falta llevar a cabo las actividades que tiendan a promover las ventas. 46 A.L.R.2d 669, 670.

En íntima relación con los factores anteriormente discutidos se encuentra el del tiempo dedicado por el contribuyente a la actividad o empresa en cuestión. "Mientras más tiempo y esfuerzo se dedique a las ventas de bienes raíces menos probabilidades hay de establecer la categoría de inversionista." Genovevo Meléndez Carruccini, pág. 228 de su citada obra. Esto no significa que el negocio de bienes raíces del contribuyente deba ser el único, inclusive su principal negocio. Contrariamente, "puede ocuparse de otros negocios

en los cuales invierta más tiempo y dinero que en el de bienes raíces y aún quedar cubierto por la regla de que sus ventas ocurrieron en el curso ordinario de su negocio." *Nolla* v. *Sec. de Hacienda*, supra, pág. 773.

Pero no resulta ser ésa la situación que se nos presenta. El recurrido en todo momento ha ejercido la profesión de abogado y si bien es cierto que no ha dedicado todo su tiempo a ese servicio, tampoco surge de la prueba que el tiempo restante lo empeñara en el "negocio" de bienes raíces. Tenida en cuenta su poca o ninguna actividad en la promoción de ventas, el tiempo por él dedicado, y que continuó dedicando, a la fecha de la vista ante el Tribunal Superior, a la agricultura y ganadería, la no tenencia de una licencia de *"dealer"* o algún otro elemento indicativo de que actuara o se representara a sí mismo como un *"dealer"* y la falta de realización de mejoras sustanciales a las propiedades adquiridas con el propósito de hacerlas más atrayentes a los compradores, nos vemos forzados a concluir que las ventas llevadas a cabo no se efectuaron como parte de un "negocio". Opuestamente creemos que las ventas realizadas fueron más bien ocasionales y aisladas que se verificaron como sucesos incidentales a la actividad de la agricultura y la ganadería a la que principalmente se dedicaba el recurrido. Es apropiado que señalemos lo dicho por el tribunal en *Snell* v. *Commissioner of Internal Revenue*, 97 F.2d 891, 892 (1938) :

"Una venta ocasional de tierras que se estime una inversión no es tal negocio. *(business)* aunque resulte lucrativa. Este término aunque se le disfrace en su ortografía y pronunciación, *significa cualidad o estado de encontrarse ocupado (busyness); implica que uno está más o menos dedicado a cierta tarea, y que tal actividad es su ocupación de entonces*. No es necesario que se dedique enteramente a ella, ni que le tome todo su tiempo. Puede ser estacional, no activa en todo el año. *Ordinariamente significa que la atención y el esfuerzo propios están envueltos en ella* . . . ." (Énfasis suplido.)

En *Fahs* v. *Crawford*, 161 F.2d 315, 317 (1947), se reitera el mismo principio mediante la expresión que copiamos:

"Por supuesto, una persona puede dedicarse a más de un negocio y puede llevar a cabo su negocio a través de otras personas. *Llevar a cabo un negocio, sin embargo, implica una empresa ocupacional a la cual uno habitualmente dedica tiempo, atención o esfuerzo con regularidad sustancial.* Meramente disponer de activos de inversión a intervalos intermitentes, sin nada más, no es el dedicarse a un negocio, aunque algún esfuerzo preliminar sea necesario para hacerlos vendibles." (Énfasis nuestro.)

En apoyo de lo anterior y al mismo tiempo otro factor que debemos considerar se refiere a la proximidad existente entre la compra de la propiedad y su venta subsiguiente. Fink, *"Dealing in Real Estate"*, 2 Tax L. Rev. 111, 118 (1946). A nuestro juicio actuó correctamente el tribunal sentenciador al determinar que "el demandante conservó sus propiedades por tiempo en exceso al que un corredor de bienes raíces conserva las que adquiere para la reventa." El remanente de las fincas de Sabana Llana adquiridas durante el período de 1938 a 1944 lo vendió a la Autoridad de Hogares en 1949, es decir, que las poseyó por un período no menor de 5 años; la finca de Isla Verde que adquiriera en marzo 26 de 1951 la vendió en agosto de 1953, o sea, 2 años y 4 meses después aproximadamente; la de Guaynabo la vendió en 1958 por lo que la poseyó durante cuatro años, ya que fue adquirida en 1954; la de Vega Alta que adquiriera en 1954 la vendió al Sr. Martorell en 1957 por lo que la poseyó por espacio de 3 años; la finca que permutó con el Sr. Peñagarícano en 1954 la había adquirido en el período de 1945 a 1949, lo que arroja un período de posesión de 5 años aproximadamente. Ese espacio de tiempo transcurrido desde que adquirió hasta que dispuso de las fincas claramente revela un comportamiento que no es común en quien adquiere propiedades con el propósito, manifestado ese propósito durante el tiempo de su posesión, de vender luego con ganancia.

■ Hay que señalar, además, que en las propiedades a que se refieren las deficiencias ante nos se cumplió con el requisito de posesión por más de 6 meses tal y como lo exige la Sec. 117(a) (4) que define lo que es una ganancia de capital a largo plazo.

■ Las circunstancias que estuvieron presentes al momento de la venta es otro ingrediente que nos sirve de guía a la determinación de si se poseyó primordialmente para la venta a parroquianos en el curso del negocio. Levin, *Capital Gains or Income Tax on Real Estate Sales*, 37 B.U.L. Rev. 165, 194, 195 (1957). Nos cita ese autor varios casos en donde por razón de circunstancias extrañas al contribuyente se ve éste obligado a despojarse de su propiedad impartiéndole un caracter de involuntariedad a la transacción que la hace favorable a un tratamiento de ganancia de capital en lugar de ingreso ordinario. Así, por ejemplo, la venta realizada debido al temor a ser expropiado se ha considerado como factor influyente a la determinación de que no se ha poseído primordialmente para la venta. Vide *Maudine Neese*, T.Ct., Dkt. No. 35402 de septiembre 16, 1953; *W. B. Malouf*, T.Ct., Dkt. Nos. 36882, 36883 de junio 30, 1955.

■ Veamos las particularidades circunstantes a las ventas de las propiedades que se encuentran ante nuestra atención: El remanente de la finca de Sabana Llana, parte de la cual fue expropiada por la Autoridad Sobre Hogares, la vendió el contribuyente a esa misma institución por temor a que le expropiaran nuevamente. El testimonio no contradicho del recurrido señala que la Autoridad Sobre Hogares le informó acerca de la necesidad de expropiar ese remanente. Creemos que ante las exigencias de la entidad mencionada estuvo fundado dicho temor; de las fincas localizadas en la zona de Cayey-Cidra vendió todo el terreno que estaba cultivado de caña a los señores Tió y Emanuelli, ya que se le fueron los dos hijos que había llevado a trabajar con él viéndose imposibilitado de atenderlo por sí mismo; la permuta del rema-

nente de las fincas antes descritas por otra finca de Guaynabo la realizó por motivos de haberse convertido el terreno en un "elefante blanco" al quedarse sin cuota para la caña como consecuencia de la venta hecha a los señores Tió y Emanuelli; la finca de Isla Verde decidió venderla ya que consideró injusta la deficiencia contributiva que le fuera notificada y pensó vender todas sus propiedades e irse de Puerto Rico; en la venta de la finca de Guaynabo fue movido por una oferta altamente beneficiosa que le dejó una ganancia de $500,000; en la finca de Hyde Park, que fue la única que urbanizó para la venta de solares, su venta se debió principalmente a una serie de disgustos experimentados que no le permitieron residir en ella luego de varios esfuerzos a ese fin. Tales sinsabores obstaculizaron el arrendamiento que sobre la finca había otorgado en favor del señor Nevárez así como también no hicieron posible su venta al Gobierno Insular y Municipal.

En resumen, con excepción de la venta que le produjera una ganancia de $500,000, en cada una de las transacciones efectuadas estuvieron presentes circunstancias extrañas al contribuyente recurrido que le imparten matices de involuntariedad a la transacción efectuada. Ese ingrediente sin duda afecta de modo negativo una determinación al efecto de que se posee primordialmente para la venta. No puede ser la intención del legislador al promover la Sec. 117 el que venga el contribuyente obligado a mantenerse en la posesión de su propiedad sin importar las contingencias que puedan surgir o más aun cuando de hecho surjan, sin que pueda disponer de la misma y esto so pena de quedar excluido del beneficio de ganancia de capital. Puede él tomar aquellas medidas necesarias en protección tanto suya como de la propiedad. Entre esas medidas se encuentra el disponer de la propiedad y sin que por ello quede afectada su condición de inversionista.

Otro hecho en favor de un tratamiento de ganancia de capital que no podemos dejar de mencionar se refiere a dos partidas en que al recurrido se le concedió el beneficio que

ahora trata de sostener. En la venta que le hiciera del remanente de la finca de Sabana Llana a la Autoridad Sobre Hogares le fueron concedidos los beneficios relativos a ganancia de capital. También ese beneficio lo obtuvo en la ganancia de $500,000 que resultara en la venta de la finca de Guaynabo.

Las conclusiones del juez sentenciador tienen base en la prueba según lo revela el récord en su totalidad; representan el balance más racional, justiciero y jurídico en la resolución del caso y por tal razón no son clara y manifiestamente erróneas.

*Se confirmará la sentencia recurrida.*